## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | | |
|---|---|---|
| SAM STAMEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:19-cv-00250-DRL-MGG |
| v. | ) | |
| | ) | |
| FOREST RIVER, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT FOREST RIVER, INC.'S MEMORANDUM
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

After a decade of work at Forest River, Inc., Sam Stamey claims he began experiencing coworker harassment in 2017. Taking Stamey's testimony at face value, his coworkers taunted him and interfered with his work area. The generalized, vulgar harassment was simply that— generalized and vulgar—and beyond the reach of Title VII and the ADEA. Then, while Stamey alleges that multiple coworkers insulted him for two years, he never identified even one to Forest River's management so that it could resolve the issue. Even so, Forest River took what actions it could to address Stamey's barebones complaints.

For the reasons explained below, the Court should grant summary judgment on Stamey's claims for discrimination, harassment, and retaliation under Title VII and the ADEA.

## STATEMENT OF MATERIAL FACTS

Forest River hired Stamey in October 2007, when he was 51 years old. (Att. 1, Stamey Dep., p. 117, lines 2-5; p. 192, lines 11-14.) Stamey pulled trailers into his area of Plant 16 and installed rough electrical wiring. (*Id.*, p. 68, lines 10-11; p. 70, lines 20-23; p. 78, line 22-p. 79, line 5.) Stamey worked in a separate location from other employees. (*Id.*, p. 70, line 20-p. 71, line 5; p. 71, lines 24-25; p. 76, lines 21-25.)

Except for a one-year layoff beginning in 2009, Forest River employed Stamey until, unannounced, he stopped coming to work in August 2018.  (*Id.*, p. 74, line 25-p. 75, line 4; p. 75, lines 11-15; p. 115, lines 6-12; p. 117, line 18-p. 118, line 4.)  Over his years at Forest River, Stamey had multiple health issues, including being "whooped," bitten, and cut by two men and his current fiancée in his sleep; chest pain; shortness of breath; Baker's cysts; gout; septic arthritis; and knee effusion.  (*Id.*, p. 12, lines 1-9; p. 21, line 17-p. 22, line 11; p. 30, lines 20-25; p. 31, lines 6-12, 20-25.)  Stamey also overdosed on medication in 2010.  (Att. 2, Lengerich Dep., p. 14, lines 17-19; Att. 3, Lotfallah Dep., p. 14, lines 7-9.)  Nonetheless, he continued to work, and Forest River historically gave him pay raises.  (Att. 1, Stamey Dep., p. 117, lines 10-15; p. 118, lines 13-23.)  And in 2015, Stamey's coworkers also collected money to support Stamey after he had a house fire.  (*Id.*, p. 120, lines 2-18.)

Stamey complains of mistreatment by his coworkers in 2017 and 2018.  Stamey cannot identify what changed after his previous decade of work.  (*Id.*, p. 88, lines 12-15; p. 90, line 22-p. 91, line 5.)  Stamey was never physically threatened, but unidentified individuals screwed, glued, and taped shut his tool cabinet.  (*Id.*, p. 84, lines 20-22; p. 130, lines 13-15.)  In addition, a penis was drawn on that cabinet and unidentified individuals wrote on it "FU Sam," "Sam loves cocks and balls," "Supper Samantha," and "old bitch."  (*Id.*, p. 84, lines 19-20; p. 88, line 4-5; p. 90, lines 4-5; p. 103, lines 17-21; p. 110, line 16-22; p. 157, line 24-p. 158, line 8; p. 160, lines 20-25.)

Unidentified individuals also made changes to Stamey's work area.  "A giant penis carved out of styrofoam" was placed on his workbench, the cord to his coffee pot was cut, and his lunch plate was sprayed with undercoating.  (*Id.*, p. 85, lines 10-13; p. 89, lines 7-8.)  Much of the complained-of conduct involved plastic zip-ties, which Stamey would easily cut with a wire-cutter.  (*Id.*, p. 169, lines 3-5; p. 170, lines 10-13; p. 171, lines 3-8.)  Stamey's lunch and personal items

were zip-tied to his coffee cup; his cigarettes were zip-tied to his drill; his ladder was zip-tied to a trailer and air hoses; his work cart was zip-tied to a trailer frame; and wires were zip-tied to a trailer.  (*Id.*, p. 85, lines 11-14; p. 170, lines 21-22; p. 171, lines 3-4; 13-14; p. 173, lines 13-15.)

Stamey's unidentified coworkers also played other miscellaneous practical jokes. Stamey's ladder was screwed to pieces of plywood; PVC pipe was connected to an air hose and "stuff" was shot into Stamey's work area; duct tape was wrapped around wire in Stamey's work cart; and screws were placed in the wheels of that cart so they would not turn.  (*Id.*, p. 85, lines 18-19; p. 86, line 22-p. 87, line 2; p. 87, lines 8-18.)  In addition, a two-third's empty drum of paint marked "flammable" was moved into Stamey's work area where he used drills and saws.  (*Id.*, p. 85, lines 19-23; p. 113, line 20-p. 114, line 11.)  The lid was loose and Stamey did not refasten it or move the drum.  (*Id.*, p. 114, lines 10-19; p. 172, lines 19-22.)

Coworkers, mostly unidentified, also made vulgar comments to Stamey and called him names such as "Walmart greeter," "grandma," "old bitch," "homo," "old man," "faggot," "queer," and other "cuss words."  (*Id.*, p. 85, lines 5-7, 15-16; p. 87, lines 3-5; p. 88, lines 5-8; p. 108, lines 6-7; p. 109, lines 19-21; p. 112, lines 15-16; p. 140, lines 16-20; p. 148, lines 21-22; p. 176, lines 23-24; p. 177, lines 15-16; p. 178, lines 6-8; p. 181, lines 20-21; p. 182, lines 2-4, 7-11, 16-17, 18-20; p. 183, lines 1-3, 8-9; p. 184, lines 8-12.)

On occasion, Stamey's coworkers would extend their middle fingers.  (*Id.*, p. 139, line 17-p. 140, line 3.)  And a bathroom sign originally stated, "Do not spit gum in urinal," but the sign was altered with a marker to read, "Do not spit cum in urinal.  Swallow.  Help keep Sam clean." (*Id.*, p. 84, line 22; p. 86, lines 17-18; p. 90, lines 11-12; p. 163, lines 9-14; p. 164, lines 11-12.)

Stamey could not identify the individuals who were making changes in his work area.  (*Id.*, p. 97, lines 16-24; p. 108, lines 11-14.)  Stamey never asked the coworkers who were friendly to

him who made the changes.  (*Id.*, p. 134, line 1-p. 135, line 1.)  Similarly, Stamey cannot identify most of the individuals who made comments to him because he did not know them.  (*Id.*, p. 98, lines 15-21.)  Stamey does recall the names of several coworkers who made comments.  (*Id.*,  p. 87, line 22-p. 88, line 1; p. 108 lines 2-10; p. 109, lines 13-16.)

Stamey cannot identify a reason for the physical changes or coworkers' comments.  (*Id.*, p. 109, line 24-p. 110, line 3.)  No one mentioned his sexual orientation.  (*Id.*, p. 141, lines 3-10.)  His coworkers used vulgar words with him, but no one commented on whether he liked men or women, the way he groomed himself, the way he dressed, whether he was feminine, or whether he had a romantic relationship with a man or a woman.  (*Id.*, p. 141, lines 3-24; p. 149, lines 5-10.)

Stamey complained regarding this conduct in 2017.  Stamey called Forest River's human resources manager and left a message "[t]hat I was being harassed," but received no response.  (*Id.*, p. 88, lines 19-20; p. 91, line 19-25; p. 92, line 7-9.)  Next, Stamey complained to Frank Pontius, his supervisor until Mr. Pontius' death in January 2018.  (*Id.*, p. 71, lines 11-13, p. 73, lines 12-13; p. 82, lines 10-14; p. 189, lines 22-23.)  Pontius was a "good boss" and Stamey complained to him, at most, ten times by "show[ing] him stuff" in Stamey's work area.  (*Id.*, p. 73, line 19; p. 96, lines 15-18.)  Stamey assumed it was employees in the bath department who were taking these actions, since the bath department was 50-75 yards from his work area.  (*Id.*, p. 98, lines 3-14.)  As a result, Pontius asked John Toy, the supervisor of the bath department, why Toy was letting his workers act in this manner and told him to "cut it out."  (*Id.*, p. 88, line 23-p. 89, line 4; p. 96 lines 5-6.)

Pontius died in January 2018, and Stamey moved into a different building under the supervision of Mike Brady.  (*Id.*, p. 73, lines 12-13; p. 82, lines 10-14; p. 84, lines 3-11.)  Stamey complained to Brady two or three times that his tools were being zip-tied and that he was being

called "Walmart greeter."  (*Id.*, p. 107, lines 1-8.)  Brady had no way of knowing who was doing this and could not resolve the issue.  (*Id.*, p. 84, lines 3-16; p. 106, lines 20-23; p. 107, lines 6-10.)

Stamey recalls that, in February or March 2018, he photographed some of the physical incidents and took them to Forest River's corporate office.  (*Id.*, p. 89, lines 11-13; p. 100, lines 6-13.)  Stamey showed the pictures to an unidentified receptionist near the entrance of the building.  (*Id.*, p. 89 lines 12-15; p. 93, lines 6-12; p. 95, lines 6-17.)  Because Wendy Tubicsak (the human resources manager) was out, the receptionist gave Tubicsak's cell phone number to Stamey and he left her a message.  (*Id.*, p. 89, lines 15-17; p. 93, lines 6-9.)

Tubicsak recalls meeting once with Stamey in 2018, when he came unannounced to her office.  (Att. 4, Tubicsak Dep., p. 5, lines 6-24; p. 8, lines 21-25.)  Stamey told Tubicsak that he was being harassed in unidentified ways by unidentified coworkers.  (*Id.*, p. 10, lines 1-7.)  Tubicsak directed Stamey to talk with Scott McDonald, the manager of Plant 16.  (*Id.*, p. 9, lines 20-25; p. 10, lines 8-13.)  Tubicsak did this "[b]ecause when an employee says they're being harassed . . . I normally like to see if they've talked to their plant manager first.  And if they haven't, I like to have them go to their plant manager to see if their plant manager can handle it."  (*Id.*, p. 10, lines 19-24.)  Stamey's meeting with Tubicsak lasted no more than a couple minutes.  (*Id.*, p. 12, lines 3-7.)  After Stamey left her office, Tubicsak called McDonald to let him know that Stamey was on his way to talk to him.  (*Id.*, p. 19, lines 16-22.)

The following day, according to Stamey, McDonald came to talk to him.  (Att. 1, Stamey Dep., p. 102, line 20-p. 103, line 7.)  Stamey complained about his cabinet being taped and/or screwed shut and the writing on the bathroom wall, and Stamey surmises that McDonald viewed the "FU" on the cabinet.  (*Id.*, p. 103, lines 4-18; p. 105, line 2.)  McDonald observed that Stamey had opened his cabinet and informed Stamey that he (Stamey) "shouldn't have went over his head."

(*Id.*, p. 89, lines 18-25; p. 103, lines 9-12.)  After this, the comments to Stamey "started getting worse."  (*Id.*, p. 97, lines 6-8; p. 130, line 5–p. 131, line 10.)  But Stamey does not know if anyone told his coworkers of his complaints.  (*Id.*, p. 131, lines 11-19.)

McDonald understood Stamey's complaints to involve "horseplay," such as "messing around with glue, silicone, messing up each other's personal and work stuff.  It's funny to grease up somebody's handle on their screwdriver or whatever."  (Att. 5, McDonald Dep., p. 12, lines 3-12.)  Soon after Stamey talked to Tubicsak, McDonald spoke individually to Stamey's supervisors, other employees who may have been involved, and their supervisor.  (*Id.*, p. 8, line 10-22; p. 11, lines 14-19, 23-25.)  McDonald said, "'The horseplay's gotta stop.  Sam, you stop.  You guys, stop.'"  (*Id.*, p. 8, lines 17-20.)  After talking to everyone possibly involved and their supervisors, McDonald believed "it was resolved" and he was unaware of any further complaints.  (*Id.*, p. 11, lines 5-22; p. 16, lines 3-18.)  Stamey never talked with the former head of human resources, Jeff Rowe.  (Att. 1, Stamey Dep. p. 91, lines 15-18; p 137, lines 5-6.)  And he never went back to Tubicsak, anyone in Forest River's corporate office, or his supervisors.  (*Id.*, p. 122, line 21-p. 123, line 7; p. 126, lines 10-15; p. 185, lines 6-9; Att. 4, Tubicsak Dep., p. 18, line 25-p. 19, line 3.)

Several months later, on June 6, 2018, Stamey filed a charge of discrimination with the EEOC.  (Att. 1, Stamey Dep., p. 122, lines 8-11.)  Within eight days, the alteration was removed from the sign in the bathroom.  (*Id.*, p. 122, lines 4-11; p. 129, lines 10-16; p. 179, lines 4-9.)  No coworker or supervisor referenced the EEOC complaint with Stamey.  (*Id.*, p. 126, lines 3-5.)

Then, in August 2018, Stamey stopped coming to work.  (*Id.*, p. 115, lines 6-12.)  Brady called Stamey to tell him, "Come in.  Come in.  You still got your job."  (*Id.*, p. 116, lines 18-20.)  Stamey resigned his employment on August 10, 2018.  (*Id.*, p. 192, lines 23-25.)  Stamey began receiving Social Security retirement payments after he stopped coming to work at Forest River.

(*Id.*, p. 143, lines 1-3.)  Subsequently, following a drunken overdose on prescription medicine, Stamey told medical personnel that he had "retired" from Forest River.  (Att. 2, Lengerich Dep., p. 13, lines 4-8; p. 14 lines 2-5; p. 16, lines 22-23; Att. 3, Lotfallah Dep., p. 21, lines 20-22.)

After Stamey left Forest River, he filed a second charge of discrimination with the EEOC on September 27, 2018.  (Att. 1, Stamey Dep., p. 124, line 23-p. 125, line 4.)  Stamey never spoke to his supervisors regarding his work situation between the two EEOC filings.  (*Id.*, p. 126, lines 3-15.)  Stamey does not identify any coworker who was treated differently than he was treated. (*Id.*, p. 130, lines 16-23.)  Stamey identifies no instances in which he was retaliated against for complaining regarding his coworkers' conduct and admits that Forest River did not retaliate against him for his complaints.  (*Id.*, p. 130, line 24-p. 131, line 7.)

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law.  In other words, the record must reveal that no reasonable jury could find for the nonmoving party."  *Dempsey v. Atchison, Topeka & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

While the moving party bears the initial burden of demonstrating that these requirements have been met, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.  Once the moving party has met this burden, the nonmoving party

must identify specific facts establishing that there is a genuine issue of fact. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986). The nonmoving party may not rest on the pleadings alone but must present fresh proof in support of its position. *Id*. at 248; *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). On a motion for summary judgment, the court must construe all facts in a light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *Chmiel v. JC Penney Life Ins. Co*., 158 F.3d 966, 968 (7th Cir. 1998).

## ARGUMENT

1. **No reasonable juror could find that Forest River discriminated against Stamey based on sex or age.**

Stamey can try to prove discrimination based on sex or age through either the direct or indirect method of proof. The same standard applies to his claims under Title VII and the ADEA. *Fields v. Bd. of Educ.*, 928 F.3d 622, 625 (7th Cir. 2019). He cannot succeed under either option.

### A. Stamey cannot show a genuine issue of material fact under the direct method.

The direct method of proof requires Stamey to produce enough evidence to "permit a jury to infer that discrimination motivated an adverse employment action." *Diaz v. Kraft Foods Glob., Inc.*, 653 F.3d 582, 587 (7th Cir. 2011) (citation omitted). Direct evidence is "something close to an explicit admission by the employer that a particular decision was motivated by discrimination." *Diaz*, 653 F.3d at 587 (citations omitted). Stamey could also prevail by "constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003) (citations omitted).

Stamey's own assertions cannot establish a link between his sex or age and Forest River's conduct. *See Winsley v. Cook County*, 563 F.3d 598, 605 (7th Cir. 2009) ("The only evidence [plaintiff] presented was her own deposition testimony that [defendant] mistreated her because of her race. These bare assertions are not sufficient to establish a link between [plaintiff's] race and

8

her treatment by [defendant].")*; Miller v. Sam's Club & Wal-Mart Stores*, No. 13 C 6467, 2015 U.S. Dist. LEXIS 126346, at *15-16 (N.D. Ill. Sep. 22, 2015) (plaintiff "has not specifically pointed to any overt or ambiguous comments, suspicious timing, preferential treatment of other employees, or other evidence").

Stamey presents no direct evidence of sex or age discrimination.  Forest River has made nothing close to an admission that any decision-maker engaged in any discriminatory action or acted with discriminatory intent.  Nor is there any "convincing mosaic of circumstantial evidence" related to the motivation of anyone who made any decision about Stamey's employment.  *Cerutti*, 349 F.3d at 1061; *see also Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1157 (7th Cir. 2014) (plaintiff "cannot rely on the direct method, since the record contains neither explicit declarations of a discriminatory motive nor sufficient circumstantial evidence for a rational jury to infer discrimination").  As such, Stamey cannot reply upon the direct method.

**B.     Stamey cannot show a genuine issue of material fact under the indirect method.**

Stamey fares no better using the indirect method of proof.  Stamey must first establish a prima facie case by showing that "(1) he is a member of a protected class; (2) he was performing well enough to meet his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees not in his protected class were treated more favorably."  *Naik v. Boehringer Ingelheim Pharms.*, 627 F.3d 596, 599-600 (7th Cir. 2010) (citation omitted); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  If Stamey successfully establishes a prima facie case, the burden shifts to Forest River to provide a legitimate, nondiscriminatory reason for the challenged action.  *See id.*; *Naik*, 627 F.3d at 600.  If Forest River does so, the burden shifts to Stamey to show that the proffered reason is pretextual.  *See McDonnell*

9

*Douglas*, 411 U.S. at 804; *Naik*, 627 F.3d at 600.  If Forest River's reason was "the true ground and not a pretext, the case is over." *Naik*, 627 F.3d at 601 (quotations and citations omitted).

Stamey is a member of a protected class, but he cannot satisfy the remaining three requirements of the indirect method for proving discrimination.  *See Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 454 (7th Cir. 2018) (the ADEA protects employees 40 years of age and older).

### 1.      Stamey cannot prove that he was meeting Forest River's legitimate expectations.

First, Stamey cannot demonstrate that he was meeting Forest River's legitimate expectations.  "When considering whether an employee is meeting an employer's legitimate expectations, this court looks to whether she was performing adequately at the time of the adverse employment action." *Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009) (quotation and citation omitted).  Stamey's self-serving statements regarding his performance cannot overcome Forest River's evidence that he was falling short of its expectations.  *See Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006) (plaintiff's conclusory and self-serving statements as to her own abilities cannot raise question of material fact); *Miller*, 2015 U.S. Dist. LEXIS 126346, at *23-24 ("It is well-established that plaintiffs cannot rely on their own vague, self-serving statements about their performance to defeat contradictory proof at summary judgment." (citations omitted)).

Here, Stamey did not meet Forest River's legitimate expectations at the time he resigned. To the contrary, he simply stopped showing up for work.  By his own admission, he "resigned" on August 10, 2018.  (Att. 1, Stamey Dep., p. 192, lines 23-25; p. 194, lines 11-14.)  Even if Forest River had taken an adverse action, Stamey's decision to stop coming to work failed to meet the company's legitimate expectations of his performance, and he cannot establish this element of his prima facie case.

      2.     **Stamey did not suffer an adverse employment action and was not constructively discharged.**

Second, Stamey did not suffer an adverse employment action; he "resigned." (*Id.*, p. 192, lines 23-25; p. 194, lines 11-14.) Stamey's allegation that he was constructively discharged does not overcome this hurdle. *See Roby v. CWI, Inc.*, 579 F.3d 779, 786 (7th Cir. 2009) (finding no constructive discharge when plaintiff "essentially just quit coming to work while [her employer] was attempting to resolve the issue"). An employee is constructively discharged if he proves that he was "forced to resign because his working conditions, from the standpoint of the reasonable employee, had become unbearable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (quotation and citations omitted). The conduct must be "so objectively offensive as to alter the conditions of the victim's employment." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998) (quotation and citations omitted). The analysis of the conduct from the standpoint of a reasonable employee "ensure[s] that courts and juries do not mistake ordinary socializing in the workplace . . . for discriminatory conditions of employment." *Id.* at 80 (quotation and citations omitted). Moreover, this constructive discharge must result from "membership in a protected class." *Smith v. Rosebud Farmstand*, 909 F. Supp. 2d 1001, 1006 (N.D. Ill. 2012) (quotations and citations omitted).

The Seventh Circuit "has recognized two different forms of constructive discharge, but neither dispenses with the requirement that the work environment had become intolerable." *Chaplin,* 621 F.3d at 679 (citations omitted). First, if an employee resigns due to alleged discriminatory harassment, he must "show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress, thereby allowing an employer to address a situation before it causes the employee to quit." *Id.* (citation omitted). Such working conditions must be extreme.

*See, e.g., Porter v. Erie Foods, Int'l, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009) (constructive discharge possible where harassment included implied threats of violence); *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1191 (7th Cir. 1992) (constructive discharge where supervisor brandished gun).

The Seventh Circuit's decision in *Fugate v. Dolgencorp* is instructive here. In *Fugate*, the comments of the plaintiff's younger supervisor to the older subordinates included: "Oh my god, I can't believe you forgot your teeth!"; "What's the matter, is this work getting too much for you? Is it too much for you to handle?"; "Oh, you probably can't get up on a ladder, right?"; "Well, you'd know how it is because you guys are the same age. You'd probably forget it too." *See Fugate v. Dolgencorp,* LLC, 2014 U.S. App. LEXIS 1856, at *1-3 (7th Cir. Jan. 30, 2014). The supervisor also made comments about the older employees being incapable of heavy lifting, directed that a particular older employee be disciplined "as often as possible," and demoted that older employee. *Id.* The court held that this conduct was not sufficiently egregious to establish a constructive discharge and granted the employer's motion for summary judgment. *Id*. at *14-16.

Stamey cannot demonstrate that his workplace had become intolerable based on any protected characteristic, so he cannot establish this form of constructive discharge. He alleges no physical threats or mistreatment. (Att. 1, Stamey Dep., p. 130, lines 13-15.) The alleged harassment consisted mostly of comments and practical jokes that, while inappropriate, demeaning, and vulgar, were not extreme. *See Scurlock v. IRC, LP*, 2017 U.S. App. LEXIS 24719, at *1-4 (7th Cir. Dec. 7, 2017) (acknowledging that reasonable jury could deem supervisor's repeated name calling—such as saying plaintiff was "'stupid,' 'dumb,' 'special,' and 'old'"—as "insulting and pervasive," but concluding that "no reasonable jury could find that this made [plaintiff's] work environment so intolerable that he was compelled to resign"). Moreover, as discussed in Section 2.A below, most of the comments and practical jokes of which Stamey

complains were not based on his membership in a protected class but rather consisted of generalized insults and horseplay. *See Smith,* 909 F. Supp. 2d at 1006.

Cases where an employee's treatment was sufficiently intolerable to justify resignation generally have involved allegations far more egregious than Stamey's and often revolve around some physical contact or fear of harm. *See Pa. State Police v. Suders*, 542 U.S. 129, 135–36, 152 (2004) (claim survived summary judgment where supervisors constantly made obscene sexual comments and gestures, one supervisor pounded on furniture to intimidate plaintiff, and executed a plan to have her arrested); *Patton v. Keystone RV Co.,* 455 F.3d 812, 816-817 (7th Cir. 2006) (finding constructive discharge where employer stalked employee and engaged in physical contact with her); *Robinson v. Sappington*, 351 F.3d 317, 330-31 (7th Cir. 2003) (finding intolerable working conditions where employee was subjected to repeated sexual remarks on a weekly basis and physically threatening conduct by a supervisor).

A second form of constructive discharge may occur "when an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002) (citations omitted). Stamey has no evidence that Forest River communicated that he would be fired. To the contrary, Stamey's supervisor urged him to return to work. (Att. 1, Stamey Dep., p. 116, lines 18-20.) For all these reasons, the Court should grant summary judgment on Stamey's claims for discrimination and constructive discharge.

### 3.    Stamey has not identified a similarly situated employee outside of the protected classes who was treated more favorably.

Stamey has not identified a similarly situated employee outside his protected classes whom Forest River treated more favorably than it treated him. *Miller*, 2015 U.S. Dist. LEXIS 126346, at *25-26. Coworkers are "similarly situated" if they were "directly comparable to the plaintiff in

all material respects." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 395 (7th Cir. 2010) (quotation and citation omitted).  Stamey has no evidence regarding this requirement.

**2.      No reasonable jury could find that Stamey was subject to a hostile work environment at Forest River.**

To survive summary judgment on his harassment claim, Stamey must show that (1) his work environment was objectively and subjectively offensive, (2) the harassment he complained of was based on his sex or age, (3) the conduct was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment, and (4) there is a basis for employer liability.  *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 880 (7th Cir. 2018) (quotations and citations omitted).  Assuming for the sake of argument that the conduct Stamey alleges was objectively and subjectively offensive, he can establish none of the other three elements.

**A.      Stamey cannot demonstrate that the harassment of which he complains was based on his sex or age.**

Stamey cannot prove that his alleged harassment was based on his sex or age.  "Title VII is an anti-discrimination statute, not an anti-harassment statute.  But [plaintiff], in contrast to the plaintiffs in *Shafer* and *Lord*, introduced evidence that the harassment was discriminatory.  Neither Shafer nor Lord offered any proof that the unwelcome sexual touching was discrimination based on sex, including any evidence that men in the workplace were treated differently from women."  *Smith v. Rosebud Farm, Inc.*, 898 F.3d 747, 752 (7th Cir. 2018).  The conduct must be "because of" membership in the protected class.  *Oncale,* 523 U.S. at 81.

Stamey has offered no evidence that women were treated differently than men at Forest River (or that men who fit traditional stereotypes of gender were treated differently than other men), or that younger employees were treated differently than older employees.  *See Stedman v. City of Terre Haute*, No. 2:17-cv-00398-JRS-DLP, 2019 U.S. Dist. LEXIS 97309, at \*24-25 (S.D.

14

Ind. June 11, 2019).  In any event, most of the behavior allegedly directed at Stamey had nothing to do with his age or sex.  Indeed, all the following actions constitute general harassment unrelated to any characteristic protected by law: zip-tying Stamey's work and personal items; fastening Stamey's work-cabinet door; drawing a penis on Stamey's cabinet and writing "FU Sam" and "Supper Samantha" on it; placing a Styrofoam penis on Stamey's workbench; cutting the cord of Stamey's coffee pot; spraying Stamey's lunch plate with undercoating; screwing Stamey's ladder to plywood; shooting "stuff" into Stamey's work area; extending middle fingers at Stamey; and writing on the bathroom wall, "Do not spit cum in urinal.  Swallow.  Help Keep Sam clean."

Similarly, none of the following comments are directed at age or sex: general "cuss words"; "You look like a penis with ears."; "What do you want, mother fucker?"; "Hey bitch, go get me that vodka.  I don't feel like walking all the way back there."; "Come on, fuck boy."; "What you want, fuck stick?"; "Look at this ugly fucker."; "You look like the homeless mother fucker who's always at Walmart eating a sandwich."; and "Sam, you want to smell my shit?"  *Cf. Galloway v. GM Serv. Parts Operations*, 78 F.3d 1164, 1168 (7th Cir. 1996) (use of word "bitch" did not constitute discrimination based on gender because "there is very little indication that it carried any of these connotations" directed at gender).

### 1.      Stamey cannot show harassment based on his sex.

Some comments could arguably be directed at Stamey's sex.  These include: "You ever sucked a sweeter dick than mine?"; "You ever sucked a dick you didn't like?"; "What's up homo?"; "homo"; "faggot," and "queer."  While these words could, in certain contexts, have meanings consistent with discrimination based on sex, that context is not present here.  *See Galloway*, 78 F.3d at 1168 (stating that "sick bitch" was, "in context, not a sex- or gender-related term," and that "there is very little indication that [the phrase] carried any of these connotations"

related to gender); *Berry v. Delta Airlines,* 260 F.3d 803, 809-10 (7th Cir. 2001) (although gender-based conduct need not be overtly sexual, conduct must be motivated by gender); *Willis v. City of Chi.*, No. 04 C 1502, 2005 U.S. Dist. LEXIS 15510, at *18 (N.D. Ill. Aug. 1, 2005) (plaintiff "has not established that the comments 'fat ass' and 'carry her ass home if she can't perform the job,' plus her co-worker's request that she go downstairs, are gender-related").  None of the other alleged harassing behavior was even arguably directed at Stamey's sex, and there is no indication that these statements were other than generalized, vulgar comments.  The "occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers" generally does not create a work environment that a reasonable person would find intolerable.  *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 941 (7th Cir. 2007) (quotations and citations omitted).

Here, Stamey never alleges that his coworkers suggested that he was homosexual, such as, for example, commenting on whether Stamey liked men or women, the way he groomed himself or dressed, whether he was feminine, or whether he had a romantic relationship with a man or a woman.  (Att. 1, Stamey Dep., p. 141, lines 7-24; p. 149, lines 5-10.)  In the context of this case, the comments of which Stamey complains do not demonstrate discrimination based on sex.

### 2.    Stamey cannot show harassment based on his age.

Some of the alleged comments by Stamey's coworkers could arguably be directed at his age: "Don't walk up on me, old man.  Ain't no wall between us."; "You still alive?  What the fuck" (or "What the F"); "What are you doing here?  I thought you died last week."; "When the fuck you retiring?"; "Looks like your dentures are about to fall out."; "You look like that old man that hangs out in front of Walmart."; "Damn, Sam, you still kicking?  You've got one foot in the grave and one on the banana peel."; and general use of the phrases "Walmart greeter," "grandma," "old bitch," and "old man."

While the comments may have been "age-based at least in part," they did not meet the standard to establish a hostile work environment. *See Tyburski v. City of Chi.*, No. 18-3000, 2020 U.S. App. LEXIS 20540, at *22 (7th Cir. July 1, 2020) ("Even insults specifically referencing age do not necessarily rise to the level of actionable harassment."); *see also Hall v. City of Chi.*, 713 F.3d 325, 335 (7th Cir. 2013) (whether comment evidences animus related to a protected characteristic "is blurry and depends on the factual context"); *EEOC v. Int'l Profit Assocs.*, 654 F. Supp. 2d 767, 800 (N.D. Ill. 2009) ("context and frequency of such comments are critical to an evaluation of their impact"); *Winchester v. Allison Transmission/GMC*, No. 1:04-cv-1153-DFH-WTL, 2006 U.S. Dist. LEXIS 59955, at *22 (S.D. Ind. Aug. 22, 2006) (granting summary judgment where none "of the other vulgarities or threats he complains of had any apparent connection to [plaintiff's] age").

**B.     Stamey cannot demonstrate that his coworkers' activities were so severe or pervasive as to alter the conditions of his employment.**

As an additional, independent reason that Forest River is entitled to summary judgment, no rational juror could conclude that the coworker comments and actions of which Stamey complains were severe or pervasive.[1]   Because courts assume that employees have thick skins, it is difficult for a plaintiff to demonstrate that conduct in the workplace is objectively offensive. *See Swyear*, 911 F.3d at 881 (citation omitted); *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998) (behavior must have been so offensive as to cause plaintiff, and any reasonable person,

---

[1] Stamey alleges coworker harassment, not supervisor harassment.  While he does allege that one "supervisor" made one harassing comment, that individual, Larry Perriguey, was not the supervisor of Stamey's department and "never had the authority to hire, fire, promote, reassign, or change the benefits of, Mr. Stamey." (Att. 1, Stamey Dep., p. 78, lines 9-12; Att. 6, Perriguey Dec. at ¶¶ 3-4.)  *See Vance v. Ball State*, 570 U.S. 421, 431 (2013) (holding that "an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." (quotations and citations omitted)).  Moreover, an isolated comment, even by a supervisor, is not sufficient to give rise to a hostile work environment that is actionable under Title VII. *See Ngeunjuntr v. Metro. Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998).

to view his work environment as intolerably hostile or abusive).  As the Seventh Circuit stated recently, "While the epithets may have made for a crude or unpleasant workplace, Title VII imposes no general civility code." *Smith v. Ill. Dep't of Transp.,* 936 F.3d 554, 561 (7th Cir. 2019) (quotations and citations omitted) (harassment must be based on a protected category).  Again, "employers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace." *Swyear*, 911 F.3d at 881.  Plaintiffs must present evidence showing "a workplace permeated with discriminatory ridicule, intimidation, and insult." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (quotations omitted).  In weighing this evidence, courts consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (quotations omitted).

The Seventh Circuit recently provided an example of conduct that created a hostile work environment based upon sex.  In *Smith v. Rosebud Farm, Inc.*, 898 F.3d 747 (7th Cir. 2018), the plaintiff was a butcher at a grocery store.  *Id.* at 749.  For four years, beginning three weeks after he started, his coworkers consistently (if not constantly) grabbed his genitals and buttocks, groped him, reached down his pants, and mimed oral and anal sex, both on the plaintiff and on each other. *Id.*; *see also Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 809 (7th Cir. 2000) (plaintiff's coworker held her face in his hands, forced his tongue into her mouth, and when she used her body to shield herself he began to unfasten her bra, stopping only when another employee entered the office); *Smith v. Sheahan*, 189 F.3d 529, 532 (7th Cir. 1999) (coworker physically assaulted plaintiff and had history of verbally abusing female coworkers).

In contrast, the court provided examples of behavior that did not create a hostile work environment in *Whittaker v. N. Ill. Univ.*, 424 F.3d 640 (7th Cir. 2005), including isolated acts of physical contact and multiple comments that were "vulgar," "coarse," and "boorish." *Id.* at 646 (quotations and citations omitted); *see also Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 463-64 (7th Cir. 2002) (plaintiff's allegations made physical contact and stared at her chest during uniform inspection while telling her to raise her arms and open her blazer were isolated incidents that, even when taken together, did not create hostile work environment); *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (plaintiff's complaints of gender-related comments during course of her employment, including that "the only valuable thing to a woman is that she has breasts and a vagina," was insufficient to demonstrate a hostile work environment).

The conduct of which Stamey complains does not reach the level of a severe or pervasive hostile work environment.  Stamey identifies crude and vulgar comments and zip-tying of his equipment.  While certainly crude and unpleasant, Stamey's workplace was not "permeated with discriminatory ridicule, intimidation, and insult." *Alexander*, 739 F.3d at 982 (quotations omitted). "To rise to the level of a hostile work environment, conduct must be sufficiently severe or pervasive to alter the conditions of employment such that it creates an abusive working environment." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009) (citation omitted); *see also Russell v. Board of Trustees of Univ. of Ill. at Chicago*, 243 F.3d 336, 343 (7th Cir. 2001) (where statements directed to plaintiff were few and far between, were not physically intimidating or threatening, and were not sexually suggestive but were merely offensive, statements did not create  hostile environment).

None of the conduct Stamey alleges was physically threatening or humiliating, as opposed to offensive utterances.  *Faragher*, 524 U.S. at 787-88.  No one touched Stamey or threatened to

do so.  Nor did the conduct unreasonably interfere with Stamey's work performance.  Stamey testified that he could quickly cut the zip ties, which was the most common form of conduct he identifies that could have interfered with his work.  (Att. 1, Stamey Dep., p. 169, lines 3-5; p. 171, lines 5-8.)  While it took him 45 minutes to open his cabinet when it was screwed shut, this only happened once, Stamey was paid for this period of time, and he does not allege that he suffered any negative consequences as a result.  (*Id.*, p. 89, lines 21-22.)  *See Lindale,* 145 F.3d at 954-56 (coworkers' actions of routinely and repeatedly logging plaintiff off her computer, taking over her work area, and generally making her work environment difficult were "an annoyance rather than an offense").  Stamey, therefore, cannot satisfy this element of his claim.

### C.      Stamey cannot demonstrate a basis for employer liability.

Stamey also cannot prove that Forest River is liable for the alleged harassment by his coworkers, and this alone is fatal to his claims of harassment based on sex or age.  Employers are liable for discriminatory acts of coworkers only if the employers are "negligent either in discovering or remedying the harassment."  *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 930 (7th Cir. 2017) (quotation and citation omitted).  "The plaintiff bears the burden of showing that the employer knew of the problem and that the employer did not act reasonably to remedy the issue once it had knowledge."  *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 904 (7th Cir. 2018) (citation omitted)

An employer is liable for a coworker's conduct "only if, knowing or having reason to know of the misconduct, the employer unreasonably fails to take appropriate corrective action."  *Guess v. Bethlehem Steel Corp.,* 913 F.2d 463, 465 (7th Cir. 1990).  "When evaluating the employer's response, the court may consider whether the employer's efforts were both timely and reasonably likely to prevent the conduct underlying her complaint from recurring."  *Jones v. Gatzambide*, 940

F. Supp. 182, 188 (N.D. Ill. 1996) (quotation and citation omitted).  The reasonableness of an employer's response depends upon what the employee reports.  *See Harbison v. Pilot Air Freight D'Smed12/22/99*, CAUSE NO. IP 99-0882-C H/G, 2001 U.S. Dist. LEXIS 5024, at *6 (S.D. Ind. Mar. 16, 2001) ("If [employee] did not report *all* of her allegations to [employer], that fact is relevant to whether [employer] responded reasonably to [employee's] complaints.").  An employer is not liable for an employee's failure to cooperate fully in disclosing and investigating allegedly harassing conduct.  *See Jones*, 940 F. Supp. at 188 ("When management attempts to delve into plaintiff's claim and plaintiff does not cooperate, she cannot later argue that management is responsible.") (quotation and citation omitted).

Stamey's inadequate reporting is dispositive.  Even though Stamey alleges that multiple coworkers made derogatory comments and interfered with his work area, he did not cooperate by providing information that would enable Forest River to address his complaints.  Stamey *never* provided anyone at Forest River with the name of a *single harassing employee*.  Instead, he left a message for Tubicsak (in human resources) regarding general harassment but gave no details.  (Att. 1, Stamey Dep., p. 91, lines 19-24; p. 92, lines 7-9.)  Stamey later complained to Pontius (his supervisor) of alterations to his work area but referenced no discriminatory comments and identified no harassing employees.  (*Id.*, p. 73, line 19; p. 96, lines 8-18; p. 97, lines 16-24.)  Even so, Pontius took the affirmative step of speaking to the supervisor of a neighboring department, just in case the offending employees were there.  (*Id.*, p. 88, line 23-p. 89, line 4; p. 98, lines 3-14.)  Stamey also complained to Brady (his supervisor after Pontius died), but again did not identify a single employee who was harassing him.  Stamey simply said that his tools were being zip-tied and that he was being called "Walmart greeter."  (*Id.*, p. 107, lines 1-8.)  Brady told Stamey that

he could not do anything because he did not know the identity of the individuals involved, and still Stamey identified no employees. (*Id.*, p. 84, lines 3-16; p. 107, lines 6-10.)

Finally, Stamey again complained to Tubicsak, either by message or brief meeting. (*Id.*, p. 89, lines 15-17; p. 93, lines 6-9; Att. 4, Tubicsak Dep., p. 5, lines 7-24; p. 8, lines 17-25.) Stamey still identified no harassing coworkers. (*Id.*, p. 10, lines 1-7.) Tubicsak nonetheless referred Stamey to his plant manager, McDonald. (*Id.,* p. 9, lines 20-25; p. 10, lines 8-13.) But then Stamey only informed McDonald of the writing on the bathroom wall and the alteration of his locker, and surmises that McDonald may have observed the "FU" written on the cabinet. (Att. 1, Stamey Dep., p. 103, lines 4-18; p. 105, lines 2-14.) McDonald correctly observed that Stamey's immediate problem—opening his locker—had been resolved, and the writing on the bathroom wall was corrected. (*Id.*, p. 105, lines 22-24; p. 129, lines 17-23.) Still, even without the identity of any harassing coworkers, McDonald spoke to anyone who might have been involved and believed the situation was resolved. (Att. 5, McDonald Dep., p. 11, lines 10-12; p. 16, lines 3-18.)

Forest River did what it could with the limited information that Stamey provided. Stamey never identified anyone who allegedly participated in the harassment, so Pontius spoke to the supervisor of a neighboring department. (Att. 1, Stamey Dep., p. 88, line 23-p. 89, line 4.) The plant manager addressed the only complaint he received by making clear to everyone that the behavior needed to stop. (Att. 5, McDonald Dep., p. 8, lines 13-20). Forest River also informed all employees that the practical jokes and comments written on company property were unacceptable and must stop. (Att. 1, Stamey Dep., Ex. 25, p. 30 (sign in plant stated that "[a]nyone caught defacing any company property will be terminated")). And the writing on the bathroom sign was erased shortly after Stamey filed his EEOC complaint. (*Id.*, p. 122, lines 4-11; p. 129, lines 10-16; p. 179, lines 4-9.)

In sum, Stamey never told anyone at Forest River (1) the scope of the harassment; (2) that the harassment involved repeated comments and alterations to his work area; or (3) the name of any harassing coworker.  Forest River responded as it was able based on the limited information that Stamey provided.  Under these circumstances, there is no basis for employer liability.

3.    **No reasonable juror could conclude that Forest River retaliated against Stamey based on a complaint of discrimination.**

Summary judgment is appropriate on Stamey's retaliation claims under Title VII and the ADEA because there is no evidence that Forest River retaliated against him.  As with his harassment claim, Stamey cannot prove retaliation through either the direct or indirect method.

A.    **Stamey cannot show a genuine issue of material fact under the direct method.**

To prove retaliation using the direct method of proof, Stamey must present evidence of (1) a statutorily protected activity; (2) an adverse action; and (3) a causal connection between the two. *Robertson v. Wis. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020).  "The mere fact that one event preceded another does nothing to prove that the first event caused the second.  Rather, other circumstances must also be present which reasonably suggest that the two events are somehow related to one another."  *Sauzek v. Exxon Coal USA,* 202 F.3d 913, 918 (7th Cir. 2000) (citations omitted).  For example, "[d]irect evidence would be an admission by the decisionmaker that the adverse employment action was motivated by discriminatory animus."  *Darchak v. City of Chicago Bd. of Educ.,* 580 F.3d 622, 631 (7th Cir. 2009).

No direct evidence of retaliation exists here because Forest River took no adverse action against Stamey.  To the contrary, Stamey stopped coming to work but his supervisor called to tell him, "Come in.  Come in.  You still got your job."  (Att. 1, Stamey Dep., p. 116, lines 18-20.) Stamey suffered no consequences from his complaints regarding his coworkers' conduct.

23

Moreover, there is no evidence that any of Stamey's coworkers who allegedly harassed him after he filed his first EEOC charge knew of it, or that anyone who knew about the charge took an adverse action against him.  Stamey does not know if McDonald or Tubicsak ever told his coworkers of his complaints.  (*Id.*, p. 131, lines 11-19.)  And Stamey's plant manager was himself unaware of Stamey's EEOC complaints.  (Att. 5, McDonald Dep., p. 11, lines 10-12; p. 16, lines 3-18.)  Stamey's retaliation claim fails for this additional, independent reason.

### B.    Stamey cannot show a genuine issue of material fact under the indirect method.

Stamey could attempt to prove retaliation by relying on the indirect method.  *McDonnell Douglas,* 411 U.S. at 802.  He would need to submit evidence showing that: (1) he engaged in protected activity; (2) he was subject to an adverse employment action; (3) he was performing his job satisfactorily; and (4) no similarly situated employee who did not engage in protected activity suffered an adverse employment action.  *See Burks v. Wis. DOT*, 464 F.3d 744, 759 (7th Cir. 2006) (citation omitted).  "The fourth element requires Stamey to show that some comparable employee received better treatment than he received."  *Fletcher v. Illinois*, No. 03-CV-857-WDS, 2006 U.S. Dist. LEXIS 80717, at *11 (S.D. Ill. Nov. 3, 2006)  (quotation and citation omitted)).

Again, Stamey offers no evidence of an adverse employment action or of a similarly situated employees who did not suffer an adverse employment action.  In the absence of such evidence, his retaliation claim cannot survive.

### CONCLUSION

At most, Sam Stamey was subjected to generalized insults and physical changes to his work area by unidentified coworkers.  This was not based upon Stamey's sex or age, and Stamey never identified a single harassing coworker to management in his generalized complaints.  Nonetheless,

24

Forest River took what action it could to address Stamey's concerns. Under these circumstances, summary judgment is appropriate on all of Stamey's claims under Title VII and the ADEA.


Dated: July 30, 2020                           Respectfully submitted,


                                               /s/ Jesse M. Barrett
                                               R. John Kuehn (22434-71)
                                               Jesse M. Barrett (23811-71)
                                               SouthBank Legal: LaDue | Curran | Kuehn
                                               100 East Wayne Street, Suite 300
                                               South Bend, Indiana 46601
                                               (574) 968-0760 (telephone)
                                               (574) 968-0761 (facsimile)
                                               jkuehn@southbank.legal
                                               jbarrett@southbank.legal

                                               *Attorneys for Defendant*
                                               *Forest River, Inc.*


## CERTIFICATE OF SERVICE

        I hereby certify that on the 30th day of July 2020, service of a true and complete copy of the attached and foregoing pleading was made upon all counsel of record through CM/ECF filing.

                                               /s/ Jesse M. Barrett
                                               Jesse M. Barrett

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| SAM STAMEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:19-cv-00250-DRL-MGG |
| v. | ) | |
| | ) | |
| FOREST RIVER, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT FOREST RIVER, INC.'S INDEX TO ATTACHMENTS**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**1.** Excerpts from Deposition of Sam Stamey on May 26, 2020
**2.** Excerpts from Deposition of Madison Lengerich on June 12, 2020
**3.** Excerpts from Deposition of Joshua Lotfallah on June 16, 2020
**4.** Excerpts from Deposition of Wendy Tubicsak on February 21, 2020
**5.** Excerpts from Deposition of Scott McDonald on February 21, 2020
**6.** Declaration of Larry Perriguey on July 16, 2020