UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

SAM STAMEY,

        Plaintiff,

v.

FOREST RIVER, INC.,

        Defendant.

CAUSE NO. 3:19-CV-250 DRL

## OPINION & ORDER

Sam Stamey installed rough electrical wiring as an employee at Forest River, Inc. In 2017, his co-workers began making crude remarks to him and pulling practical jokes. On August 10, 2018, he resigned from Forest River. After filing two administrative charges of discrimination, Mr. Stamey brought this action against the company, alleging sex and age discrimination, constructive discharge, hostile work environment, and retaliation claims under Title VII and the Age Discrimination in Employment Act. *See* 42 U.S.C. § 2000e-3; 29 U.S.C. § 621 *et seq*. Forest River moved for summary judgment on all claims. The court now grants summary judgment.

## BACKGROUND

Forest River hired Sam Stamey in October 2007 when he was 51 years old (ECF 31-1 at 117, 192). He worked in the options department at Plant 16, pulling trailers into his area and installing rough electrical wiring (*Id.* at 68, 70, 79). Mr. Stamey says his co-workers began harassing him in 2017, though he doesn't know why they started to do so (*Id.* at 88, 90).

Mr. Stamey wasn't ever physically threatened (*Id.* at 130), though the harassment involved many practical jokes. Unidentified co-workers screwed, glued, and taped his tool cabinet shut; they also drew a penis on that same cabinet and wrote things on the cabinet and the bathroom walls like "FU Sam," "Sam loves cocks and balls," "Supper Samantha," and "old bitch" (*Id.* at 84, 88, 90, 103,

110, 157-58, 160). Someone changed a sign in the bathroom to say, "Do not spit cum in urinal. Keep Sam Clean" (*Id.* at 86). Unidentified co-workers placed a giant styrofoam penis on his workbench, cut the cord to his coffee pot, and sprayed his lunch plate with undercoating (*Id.* at 85, 89). Unidentified co-workers also played several pranks on him involving zip-ties—they zip-tied his lunch and coffee cup together, his cigarettes to his drill, and his ladder to the trailer and air hoses, among other things (*Id.* at 85, 169-73). Mr. Stamey doesn't know who pulled these pranks (*Id.* at 97).

Mr. Stamey estimates that there were thousands of insults hurled at him over time by two dozen offenders at all hours of the workday, many of which were based on his age (ECF 36-1, ¶ 4(H); ECF 36-2 at 193-94). People called him "Walmart greeter, grandma, old bitch, and a lot more stuff" (ECF 31-1 at 85). It was "mostly old man, you old bitch, probably, a thousand times" (*Id.*). Someone told him he looked like "that old man that hangs out in front of Walmart" (*Id.* at 112). Other comments included: "You still alive? What the F?" (*Id.* at 109); "Don't walk up on me, old man. Ain't no wall between us" (*Id.* at 177); "What are you doing here? I thought you died last week" (*Id.* at 181); "You look like that homeless mother fucker who's always at Walmart eating a sandwich" (*Id.* at 182); "When the fuck you retiring?" (*Id.*); and "What's up homo? Looks like your dentures are about to fall out" (*Id.* at 183). This list isn't exhaustive. Mr. Stamey says he has "been called every cuss word" (*Id.* at 88).

Mr. Stamey's fiancée, Ruth Vanvorst, called Jeff Rowe in human resources to report the harassment, and Mr. Rowe suggested that Mr. Stamey call Wendy Tubicsak, who also worked in HR (*Id.* at 88, 91). Sometime in 2017, Mr. Stamey called Ms. Tubicsak and left her a voicemail, but he never heard back from her (*Id.*). It isn't known why. Since he didn't hear back from Ms. Tubicsak, he then went to his supervisor, Frank Pontius (*Id.* at 92, 96). Mr. Pontius conferred with John Toy, who supervised the neighboring bath department (*Id.* at 89, 92, 96). Mr. Toy told Mr. Stamey that all of this was going to stop (*Id.* at 89, 92). Over the course of around two months in 2017, Mr. Stamey had about ten different conversations with Mr. Pontius about the harassment (*Id.* at 96-97). After these

2

conversations, the harassment stopped for about two or three weeks (ECF 36-1 ¶ 4(A); ECF 36-2 at 96, 100).

After Mr. Pontius died in January 2018, Mike Brady became Mr. Stamey's new supervisor (ECF 31-1 at 106). Mr. Stamey talked with Mr. Brady about the harassment on two or three occasions (*Id.* at 107). Mr. Stamey specifically told him about zip-tie pranks and people calling him "Walmart greeter" (*Id.*), though he earlier said the conversations were about "people taping my stuff up, zip-tying, spraying, calling me homo, old man, Walmart greeter" (*Id.* at 106). Mr. Brady said there was nothing he could do because he didn't know who was doing it (*Id.* at 107). Mr. Stamey told Mr. Brady that it was probably Blake, Ben, and Will (last names unknown) who were doing the pranks because they were always calling him names (*Id.* at 108); however, Mr. Stamey admits that he couldn't tell Mr. Brady who was doing it because he didn't know for sure who it was (*Id.*). Mr. Brady seems not to have done anything more. It's unknown why not.

Around April 2018, Mr. Stamey brought pictures of some of the things that had been written on his cabinet and the bathroom walls to Forest River's corporate office (*Id.* at 89). He showed the pictures to the receptionist and asked to speak with Ms. Tubicsak, but she wasn't there (*Id.* at 89). As soon as he walked out the door, Mr. Stamey left another voicemail for Ms. Tubicsak, but again she never responded (*Id.* at 92, 95; ECF 36-1 ¶ 4(E)). Ms. Tubicsak, on the other hand, remembers speaking with Mr. Stamey for just a couple of minutes in person at one point (ECF 31-4 at 9). Mr. Stamey told her that he was being harassed, and Ms. Tubicsak told him he should speak with his plant manager first (*Id.* at 10). Crediting Mr. Stamey on this point as the court must at the summary judgment stage, it nonetheless remains undisputed that Ms. Tubicsak called his plant manager, Scott McDonald, and told him that Mr. Stamey would be coming to speak with him (*Id.* at 19).

The next day, Mr. Stamey had a conversation with Mr. McDonald (ECF 31-1 at 89, 100). Mr. McDonald told Mr. Stamey that he "shouldn't have went over his head" (*Id.* at 89). Mr. McDonald

3

then had a conversation with a group of employees, in which he said, "The horseplay's gotta stop" (ECF 31-5 at 8). Although Mr. Stamey says the harassment interfered with his work, he never had his pay reduced for being less productive at work (ECF 31-1 at 113). In fact, he continued to get raises during his time with Forest River (*Id.*). He was never disciplined for his performance at work (*Id.*).

On June 6, 2018, Mr. Stamey filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), alleging that his "co-workers have insulted, taunted, and tormented [him] on account of his age and on account of sex in violation of the ADEA and Title VII" (*Id.* at 122; ECF 36-1 at 7). On June 14, 2018, Mr. Stamey noticed that the spray-painted sayings on the bathroom walls were gone (ECF 31-1 at 90), and the pranking of his workstation stopped, but he says the verbal insults persisted and got worse (ECF 36-1 ¶ 4(H)). Forest River investigated the charge and sent its position statement to the EEOC on July 9, 2018 (ECF 36-3, Ex. 1). That statement recounts many of the facts from this record—at one point, Mr. Stamey resolved the issues with Mr. Pontius and Mr. Toy; at a later point, Mr. Stamey resolved the issues with Mr. McDonald after first approaching Ms. Tubicsak (*Id.*). After that, Forest River was not aware of any further issues or matters to address with Mr. Stamey (*Id.*).

In August 2018, Mr. Stamey stopped going into work (ECF 31-1 at 115). He says "the last straw" was when Larry Perriguey, a supervisor in another department, said to him, "Damn, Sam, you still kicking? You've got one foot in the grave and one on the banana peel" (*Id.* at 87-88, 115-16). Mr. Perriguey had no supervisory authority over Mr. Stamey (ECF 31-6 ¶ 4). Mr. Stamey's supervisor, Mr. Brady, called him and told him to come back in and that he still had his job (ECF 31-1 at 116). Despite that phone call, Mr. Stamey resigned on August 10, 2018 (*Id.* at 125; ECF 36-1 ¶ 2). On account of the alleged harassment, Mr. Stamey lost sleep and felt like his nerves were shot, though not to the extent that he complained to a doctor or sought treatment for his condition (ECF 31-1 at 145-46; ECF 36-1 ¶ 4(J)).

4

Between the day he filed his first EEOC charge and the day he quit, Mr. Stamey didn't speak with anyone at Forest River about the harassment (ECF 31-1 at 126; ECF 31-5 at 16). After he left, he filed a second charge of discrimination with the EEOC (ECF 5 ¶ 6). He then brought this action in March 2019 (*Id.*). On July 30, 2020, Forest River moved for summary judgment on all of Mr. Stamey's claims (ECF 30), and its motion is now ripe for review.

## STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). The court must construe all facts in the light most favorable to the non-moving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Nor is the court "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant a summary judgment motion when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dept. of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011).

DISCUSSION

    A.    *Abandoned or Dismissed Claims.*

Though Mr. Stamey commenced this suit with several claims, he has since abandoned these claims in favor of an ADEA hostile environment claim and constructive discharge claim for purposes of summary judgment. *See Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008). After oral argument on February 22, 2021, Mr. Stamey moved to dismiss his ADEA hostile environment claim because he cannot recover damages for pain and suffering or emotional distress under the law. *See Fugate v. Dolgencorp, LLC*, 555 Fed. Appx. 600, 603 n.1 (7th Cir. 2014) (citing *Barton v. Zimmer, Inc.*, 662 F.3d 448, 454-55 (7th Cir. 2011); *Franzoni v. Hartmax Corp.*, 300 F.3d 767, 773-74 (7th Cir. 2002)). That claim is dismissed accordingly, with others shown abandoned at summary judgment. Only Mr. Stamey's constructive discharge claim under the ADEA remains for adjudication.

    B.    *Constructive Discharge under the ADEA.*

Mr. Stamey says he was constructively discharged from Forest River because of age-based harassment. For Mr. Stamey to establish a constructive discharge claim, he must prove that because of his age he was subjected to working conditions "so intolerable that a reasonable person would have been compelled to resign." *Fugate v. Dolgencorp, LLC*, 555 Fed. Appx. 600, 605 (7th Cir. 2014) (quoting *Bennington v. Caterpillar, Inc.*, 275 F.3d 654, 660 (7th Cir. 2001)). He must show "working conditions even more egregious than that required for a hostile work environment claim." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). The threshold is "extremely high." *Fugate*, 555 Fed. Appx. at 606. It is not enough to show the conditions merely to be unprofessional or boorish. *See id.*

There are two forms of constructive discharge. *Chapin*, 621 F.3d at 679. Both forms require that the work environment has become intolerable. *Id.* In the first, the employee resigns due to alleged discriminatory harassment; in the second, the discharge occurs because the employer has acted in a manner so as to have communicated to a reasonable employee that he will be terminated. *Id.* Mr.

Stamey hasn't alleged any facts to show that Forest River acted in a manner so as to have communicated to him (or any reasonable person in his position) that he would be terminated. In fact, after Mr. Stamey stopped coming to work, his supervisor called him and said, "Come in. Come in. You've still got your job" (ECF 31-1 at 116). Therefore, the court treats Mr. Stamey's constructive discharge claim as only based on the first type.

In reviewing the alleged discriminatory harassment, the court focuses on the insults or pranks that were based on age. *See Fugate*, 555 Fed. Appx. at 605 (plaintiff needs proof that *because of his age* he was subjected to intolerable working conditions). Here, that leaves hundreds, if not thousands, of comments made to Mr. Stamey (ECF 31-1 at 85). Co-workers called him "old man, you old bitch, probably, a thousand times" (*Id.*). Other age-based comments from co-workers included: "You still alive? What the F?" (*Id.* at 109); "Don't walk up on me, old man. Ain't no wall between us" (*Id.* at 177); "What are you doing here? I thought you died last week" (*Id.* at 181); "When the fuck you retiring?" (*Id.* at 182); and "What's up homo? Looks like your dentures are about to fall out" (*Id.* at 183). Aside from those comments, co-workers repeatedly called him "Walmart greeter" (*Id.* at 85), which a reasonable jury could say was based on age. The physical pranks have a more attenuated connection to age, if any at all, though "old bitch" was one of the things that was written on his cabinet (*Id.* at 110). Still, the court remains mindful of the broader context and harassment in which these age-based comments were being made. *See Lindale v. Tokheim Corp.*, 145 F.3d 953, 956 (7th Cir. 1998) ("one can imagine a case in which the working conditions are already so poor, albeit for reasons unrelated to any invidious discrimination, that it requires less of a discriminatory 'shove' to make a reasonable worker consider his working conditions intolerable").

Mr. Stamey points to one incident as being the last straw (ECF 35 at 14). He says what prompted him to quit was "the fact that a supervisor, Larry Perriguey, had taunted him on account of his age in full view of his co-workers" (*Id.*). Mr. Perriguey said to him, "Damn, Sam, you still kicking?

You've got one foot in the grave and one on the banana peel" (ECF 31-1 at 87-88, 115-16). While Mr. Perriguey was a supervisor at Forest River, he wasn't one of Mr. Stamey's supervisors (ECF 31-6 ¶ 4).

In *Fugate*, this circuit held that the plaintiff hadn't met the "extremely high standard for a constructive discharge" even after establishing that her supervisor made offensive, age-related comments to her such as "Oh my god, I can't believe you forgot your teeth!" and "What's the matter, is this working getting too much for you? Is it too much to handle?" *Fugate*, 555 Fed. Appx. at 602, 606. Mr. Perriguey's single comment—while unpleasant like the comments in *Fugate*—cannot be reasonably construed as making Mr. Stamey's working conditions so intolerable that he had no choice but to resign, even in the larger context of the comments and conduct that came before.

To be sure, the facts here aren't nearly as egregious as those from other cases where courts have found sufficient evidence for a constructive discharge claim to proceed. *See, e.g.*, *Pa. State Police v. Suders*, 542 U.S. 129, 135-36 (2004) (constructive discharge claim remanded for trial when plaintiff's supervisors constantly made obscene sexual comments and gestures, one supervisor pounded on furniture to intimidate her, and supervisors devised and executed a plan to have her arrested for theft); *Porter v. Erie Foods, Int'l, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009) (repeated use of a noose and implied threats of physical violence qualify as egregious for purposes of constructive discharge); *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1191 (7th Cir. 1992) (harassment included supervisor making racist comments to the plaintiff and brandishing a firearm and holding it up to the plaintiff's head). Mr. Stamey concedes that he was never physically threatened (ECF 31-1 at 130), and the pranks, while certainly boorish and no doubt aggravating, weren't so egregious as to be unbearable.

That said, the harassment here is worse than other cases where the law hasn't found sufficient evidence for constructive discharge. *See, e.g.*, *Chapin*, 621 F.3d at 679 (one threat and raised voices is not enough for hostile work environment or constructive discharge); *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000) (no constructive discharge where the plaintiff's supervisor

8

parroted back a racist phrase from the movie *N\*\*\*ers with Hats* to the plaintiff). Mr. Stamey didn't suffer through one or a few comments, but hundreds, if not thousands, of instances of being called "old man,' "old bitch," or "Walmart greeter" (ECF 31-1 at 85).

The undisputed facts don't permit a reasonable jury to find a basis for constructive discharge, however. In *Scurlock v. IRC, LP*, 716 Fed Appx. 544, 545 (7th Cir. 2017), for instance, the plaintiff, who was fifty years old at the time of being hired, worked for a nightclub. His direct supervisor called him "stupid," "dumb," "special," and "old," and this happened "a lot of times." *Id.* This circuit decided that, while the name calling may have been humiliating, no reasonable jury could find that it created a work environment so intolerable such that the plaintiff was compelled to resign. *Id.* at 546.

The same conclusion is unavoidable here. In Mr. Stamey's case, some comments were more colorful and shameful than "old," such as "I thought you died last week" and "When the fuck are you retiring" (ECF 31-1 at 181-82). None of the comments were made by Mr. Stamey's direct supervisors. That doesn't excuse this behavior at all or shield the company from liability, but a working environment is more intolerable when the boss is the one causing the harassment rather than coworkers. *See Robinson v. Sappington*, 351 F.3d 317, 330-31 (7th Cir. 2003) (analyzing the harassment in the context of the working relationship).

Mr. Stamey's work environment was fairly hostile under the ADEA, but the ADEA affords no recovery for him because he maintained his wages, because he cannot recover emotional distress under this federal law for a hostile work environment, and because other monetary relief would hinge on his receipt of some nominal form of damages. *See Pfeiffer v. Essex Wire Corp.*, 682 F.2d 684, 688 (7th Cir. 1982) ("punitive damages and damages for pain and suffering are not available under the ADEA"); *Kossman v. Calumet County*, 849 F.2d 1027, 1028 (7th Cir. 1988) (liquidated damages are available under the ADEA but only to complement compensatory damages); *Mounson v. Moore*, 117 Fed. Appx. 461,

462 (7th Cir. 2004) (district court cannot award attorney fees unless there has been some nominal recovery on merits).

What's more, "absent extraordinary conditions, a complaining employee is expected to remain on the job while seeking redress." *Cooper-Schut v. Visteon Automotive Sys.*, 361 F.3d 421, 428-29 (7th Cir. 2004). It isn't reasonable for an employee to assume that his employer will fail to protect him without giving the employer a chance to try. *Id.* at 429. No one will give Forest River an A+ grade here. Though Forest River may not have done a perfect job of handling Mr. Stamey's complaints in the past, Mr. Stamey should have worked within the system before quitting. In reviewing how Mr. Stamey reported his complaints to Forest River, the court is mindful of inconsistencies between Mr. Stamey's deposition testimony and his affidavit. The court disregards portions of the affidavit that contradict his deposition testimony. *See James v. Hale*, 959 F.3d 307, 315-16 (7th Cir. 2020).

Sometime in 2017, Mr. Stamey's fiancée reported harassment to Jeff Rowe in human resources, who referred Mr. Stamey to Wendy Tubicsak (ECF 31-1 at 88, 91). Mr. Stamey apparently left Ms. Tubicsak a voicemail, but she never called him back (*Id.*). Though it seems she dropped the ball by not responding to his voicemail, Mr. Stamey also reported the harassment to his supervisor, Frank Pontius, and the supervisor of the neighboring bath department, John Toy, around December 2017 (ECF 31-1 at 89, 92, 96; ECF 36-1 ¶ 4(A)). They promptly addressed the issue. After that, the harassment stopped for about two or three weeks (ECF 36-1 ¶ 4(A); ECF 36-2 at 96). Unfortunately, the harassment picked up again, but the fact that it ceased shows that Mr. Stamey's effort to seek redress from his supervisors wasn't futile.

Once the harassment recommenced in early 2018, Mr. Stamey complained to his new supervisor, Mike Brady (Mr. Pontius had since passed away). Mr. Stamey told Mr. Brady about "people taping [his] stuff up, zip-tying, spraying, calling [him] homo, old man, Walmart greeter" (ECF 31-1 at 106-07). On this record, he shared no other concerns. Mr. Brady said there was nothing he could do

10

because he didn't know who was doing it (*Id.* at 107). Mr. Stamey told Mr. Brady that it was probably "Blake, Ben, and Will" who were doing the pranks because they were calling him names (ECF 36-2 at 108); however, Mr. Stamey agreed that he couldn't tell Mr. Brady who was doing it because he didn't know for sure who it was (ECF 31-1 at 108). Mr. Brady wasn't terribly effectual on this record. He seems not to have spoken to "Blake, Ben, and Will" or addressed his employees in a department-wide meeting.

Mr. Stamey still pressed on. In April 2018, he left another voicemail for Ms. Tubicsak (ECF 31-1 at 92, 95; ECF 36-1 ¶ 4(E)). Though it would have been wise for her to respond to Mr. Stamey, if nothing else to share that she had received his message and to inform him of the action she intended to take, she then called the plant manager, Scott McDonald, to let him know about the complaint (ECF 31-4 at 19). This was the first Mr. McDonald had learned of the harassment. The next day, Mr. McDonald told Mr. Stamey that he "shouldn't have [gone] above his head" (ECF 31-1 at 103).[1] Notwithstanding the ostensible lack of receptiveness during that meeting, Mr. McDonald indisputably took action to rectify the situation. After speaking with Mr. Stamey, the next day Mr. McDonald talked to Mr. Stamey's supervisor, the supervisor of the employees he believed were doing it, and these employees and told them to cut it out (ECF 31-5 at 8, 11). Mr. McDonald believed it was addressed (*Id.* at 16). On this record, Mr. Stamey never returned to Mr. McDonald to seek his help again.

Instead, on June 6, 2018, Mr. Stamey filed a charge of discrimination with the EEOC (ECF 31-1 at 122; ECF 36-1 at 7). On June 14, 2018, Mr. Stamey noticed that the spray-painted sayings on the bathroom walls were gone (ECF 31-1 at 90), and the pranking of his workstation stopped (ECF 36-1 ¶ 4(H)). Forest River believed the issues had been resolved—first by Mr. Pontius and Mr. Toy,

---

[1] In his affidavit, Mr. Stamey says this is the only thing that Mr. McDonald said to him during that conversation (ECF 36-1 ¶ 4(F)). However, during his deposition, Mr. Stamey said that Mr. McDonald then observed his cabinet, and Mr. Stamey told him about the bathroom (ECF 31-1 at 103). Forest River cleaned up the writing on the bathroom walls on June 14, 2018, after Mr. Stamey filed his first EEOC charge (ECF 31-1 at 129).

and later by Mr. McDonald (ECF 36-3, Ex. 1). However, Mr. Stamey says the verbal insults persisted and got worse, though he didn't mention that to anyone at Forest River (ECF 36-1 ¶ 4(H); ECF 31-1 at 126).[2] He says the last straw was when Mr. Perriguey made fun of him in front of his coworkers, but he never reported that incident to anyone at Forest River either (ECF 31-1 at 126). The statement that day was again coarse and inappropriate, but it isn't of the degree that would cause one to quit constructively, even on the heels of what happened before.

Mr. Stamey assumed that his supervisors would be of no help to him, but it wasn't reasonable for him to make that assumption, particularly when Forest River's system of handling complaints had worked, on occasion perfectly well and on other occasions less well, but never to the point where seeking the ear of a responsive supervisor was futile. *See Cooper-Schut*, 361 F.3d at 429. Aside from that, there was no extraordinary condition here—no violence, no threat of violence, no improper physical touching, no scheme to accuse him of a crime, no act so egregious or unbearable and no resounding silence in the face of myriad complaints that justify a decision to resign without seeking redress for the harassment through his employ. *See, e.g., Roby v. CWI, Inc.*, 579 F.3d 779, 785 (7th Cir. 2009) (no constructive discharge where there wasn't evidence of threats to the plaintiff or to the plaintiff's employment that would lead a reasonable person to believe that she needed to quit her job to protect herself).

The court condones none of the behavior described on this record. Mr. Stamey abandoned or dismissed his hostile work environment claims and for reasons that seem sound. To be clear then, the court isn't deciding whether the conduct here was hostile or not. If the ADEA were written differently to permit recovery of emotional distress damages, the result here may well have been different on that

---

[2] The court disregards Mr. Stamey's inconsistent statement in his affidavit that he approached Mr. Brady for a second time after he filed his charge of discrimination (ECF 36-1 ¶ 4(I)) because Mr. Stamey testified that he did not go to his supervisors to talk between June 2018, when he filed his first complaint, and when he quit (ECF 31-1 at 126).

12

claim, and that claim might have proceeded to trial. The only issue the court must decide is whether sufficient evidence exists of constructive discharge, and the standard for that claim is extremely high and greater than a hostile environment claim. *See Fugate*, 555 Fed. Appx. at 606; *Chapin*, 621 F.3d at 679. The working conditions must be so egregious and so intolerable that a reasonable person would be compelled to resign. The record here won't allow a reasonable jury to conclude that Mr. Stamey's employment environment, though certainly churlish, was so egregious or unbearable as to cause his constructive discharge. Rather than seek redress through quitting, he had the opportunity to turn swiftly to the plant manager once more to stop it, as he had done before. Accordingly, the court grants summary judgment on the constructive discharge claim.

## CONCLUSION

Construing all facts and reasonable inferences in favor of Sam Stamey, the court GRANTS Mr. Stamey's motion to dismiss his ADEA hostile environment claim (ECF 43), GRANTS Forest River's motion for summary judgment on all other claims (ECF 30), and DIRECTS the clerk to enter judgment for the company accordingly. This order terminates the case.

SO ORDERED.

March 2, 2021
*s/ Damon R. Leichty*
Judge, United States District Court